IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHAWN MANNS,

    Plaintiff,

      v.

CITY OF ATLANTA, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:06-CV-0609-TWT

## ORDER AND OPINION

This is an employment discrimination action.  It is before the Court on the

Defendants' Motion for Summary Judgment [Doc. 59].  For the reasons set forth

below, the Motion is GRANTED in part and DENIED in part.

## I.  Background

The Atlanta Fire Department ("AFD") employs Shawn Manns as a Captain.  He

is suing the City of Atlanta and the former Fire Chief of the AFD, Dennis Rubin, in

his individual capacity.  In May of 2003, the Plaintiff was promoted to the rank of

captain.  In August 2003, the Plaintiff was promoted to the position of Provisional

Section Chief of the Office of Professional Standards ("OPS").  (Defs.' Mot. for

Summ. J., at 1).  The Plaintiff had served as a "Lieutenant / Investigator" in OPS since

November 1998.  (Pl.'s Resp. to Defs.' Statement of Facts ¶ 3).  Rubin served as the

Fire Chief of the AFD from December 2003 to June 2007. (Rubin Dep. at 4-5). Prior to December 2003, Kenneth Allen was the Acting Fire Chief. He promoted the Plaintiff to the Provisional Section Chief of OPS. (Defs.' Statement of Material Facts ¶ 8).

Shortly after Rubin assumed leadership of the AFD, he expressed dissatisfaction with the Plaintiff's job performance. One of the Plaintiff's chief responsibilities as Provisional Chief of the OPS was recruitment. According to Rubin, when he arrived in December 2003, there were over 150 vacancies in the AFD. (Rubin Dep. at 11). He said that the Plaintiff's job performance was "the worst [he had] ever seen." (Rubin Dep. at 20). On July 14, 2004, Rubin instituted a new selection criteria for section chiefs. As part of the new criteria, applicants were required to pass an examination administered by the City. In order to be eligible for the exam, applicants must have served with the rank of Chief or Captain for two years. (Defs.' Statement of Material Facts ¶ 34-35). At the relevant time, the Plaintiff had only served as Captain for 14 months. (Defs.' Statement of Material Facts ¶ 40). The Plaintiff was subsequently informed that would be removed from the provisional position as OPS Chief as of August 12, 2004. (Reply Br. in Supp. of Defs.' Mot. for Summ. J., at 3). The qualifying test for aspiring Chiefs was administered August 14, 2004. (Manns. Dep. at 126). When the Plaintiff learned of his removal from his

provisional post, he applied for administrative leave with pay.  Rubin denied this request.  (See generally, Defs.' Mot. for Summ. J., at 10-11).

The Plaintiff brought this action in March 2006, alleging violations of Title VII and 42 U.S.C. § 1981 and § 1983.  This Court subsequently granted the Defendants' Motion to Dismiss as to the Title VII claims [Doc. 20], adopting the Final Report and Recommendation of the Magistrate Court.  [Doc. 18].  The Defendants now move for summary judgment on the § 1981 and § 1983 claims.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

A.    <u>City of Atlanta's Liability</u>

The Defendants argue that summary judgment is appropriate for the City's liability because the City does not have an unconstitutional custom or policy that supports discrimination or retaliation.  Generally, "[a] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  <u>Monell v. New York City Dept. of Social Servs.</u>, 436 U.S. 658, 694 (1978).  The Plaintiff argues that whether or not there is a custom or policy of discrimination is irrelevant, and that a local government might still be liable if the injury can be traced back to the conduct of a final policymaker.  <u>See, e.g.</u>, <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112 (1998).  All parties agree that Rubin, as then-Chief of the AFD, had a great deal of discretion over hiring decisions within the AFD.  Further, the Defendants admit that Rubin was acting within his discretionary capacity when he made the decision relating to the Plaintiff's rank.  (Defs.' Mot. for Summ. J., at 14).  The Plaintiff argues that such a policymaker may "set forth official policy with one act."  (Pl.'s Resp. to Defs.' Mot for Summ. J., at 5) (citing <u>Morro v. City of Birmingham</u>, 117 F.3d 508, 510 (11th Cir. 1997)).

The City of Atlanta and the AFD had policies prohibiting discrimination on the grounds of race in employment practices and decisions.  The Plaintiff has not pointed

to any evidence that the City delegated to Rubin the authority to ignore those policies in making individual employment decisions with respect to the Plaintiff.  Simply put, Rubin was not making "policy" when he demoted the Plaintiff and denied his request for administrative leave with pay.  Those are the types of routine personnel decisions that are made in any municipal department of government.  The fact that the decisions were made at a "high" level does not subject the City to § 1983 liability.  Praprotnik, 485 U.S. at 125 n.2.  "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability."  Id. at 126.  "When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality."  Id. at 127.

In addition, Rubin was not  a final policymaker because the City had adopted a "meaningful administrative review" of his personnel decisions.  Morro, 117 F.3d at 514; see also Praprotnik, 485 U.S. 112, 129-30 (1988) ("If city employment policy was set by the [Mayor, Councilmen, and by the Civil Service Commission], only those bodies' decisions would provide a basis for city liability.  This would be true even if the [Mayor and Councilmen and the Commission] left the appointing authorities discretion to hire and fire employees and they exercised that discretion in an unconstitutional manner.").  Whether or not an official has final policymaking

authority "is governed by state law, including valid local ordinances and regulations."
Martinez v. City of Opa-Locka, Fla., 971 F.2d 708, 713 (11th Cir. 1992).  The City of
Atlanta has a civil service board which has the authority to review any allegedly
discriminatory personnel decisions and "there is no evidence that the Board merely
rubber-stamps the decisions of the appointing authorities."  Scala v. City of Winter
Park, 116 F.3d 1396, 1402 (11th Cir. 1997).  Accordingly, the Motion for Summary
Judgment should be granted as to the Plaintiff's claims against the City of Atlanta.

      B.     Non-promotion Claim

The Plaintiff alleges racial discrimination under 42 U.S.C. § 1981.  Section
1981 prohibits racial discrimination in the making and enforcement of private
contracts.  42 U.S.C. § 1981.  Because claims brought under section 1981 and Title
VII of the 1964 Civil Rights Act[1] are analyzed under the same framework, these
statutes have the same requirements of proof.  See Standard v. A.B.E.L. Servs., Inc.,
161 F.3d 1318, 1330 (11th Cir.1998).  A plaintiff can establish a prima facie case of
disparate treatment under Title VII with direct or statistical evidence, or he may use
circumstantial evidence to satisfy the four-part test outlined in McDonnell Douglas
Corp. v. Green, 411 U.S. 792 (1973).  See also Earley v. Champion Intern. Corp., 907

---

[1]42 U.S.C. § 2000e-1 *et seq.*

F.2d 1077, 1081 (11th Cir. 1990).  Here, the Plaintiff has not produced any direct evidence indicating that race motivated the failure to promote him to OPS Chief.

To establish a prima facie case of disparate treatment based on circumstantial evidence, a plaintiff must show that he: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by a person outside the protected class or suffered from disparate treatment because of membership in that class.  Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002).  A plaintiff's burden of proving a prima facie case is light, but summary judgment for the employer is appropriate if the plaintiff fails to satisfy any of these elements.  Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1180 (11th Cir. 2003); see also Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) ("Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination.").

A plaintiff's prima facie case raises a presumption of illegal discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).  The burden then shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the employment decision.  See McDonnell Douglas Corp., 411 U.S. at 802; Kelliher, 313 F.3d at 1275.  This intermediate burden is "exceedingly light."  Holifield, 115 F.3d

at 1564.  After the employer articulates such a reason, the plaintiff has the opportunity to demonstrate that this reason is merely a pretext for discrimination.  Such pretext may be demonstrated either through additional evidence showing "the employer's proffered explanation is unworthy of credence," Burdine, 450 U.S. at 256, or by relying only on the evidence that comprised the prima facie case.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).  In reviewing the defendant's explanation, however, the Court cannot usurp an employer's legitimate business judgment in the absence of evidence of discrimination.  E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000) (stating that "in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of law").  Indeed, once a defendant proffers a non-discriminatory and legitimate reason for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual."  Chapman, 229 F.3d at 1037.  In other words, the plaintiff must be able to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  Cooper v. Southern

Co., 390 F.3d 695, 725 (11th Cir. 2004) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).

In this case, the Plaintiff has made out a prima facie case by showing that he was black, that he was qualified for the promotion and that the position was filled by a white man.  The Defendants, however, have shown a legitimate non-discriminatory reason for the failure to promote the Plaintiff.  It is undisputed that the Plaintiff did not apply for the promotion to OPS Chief.  Therefore, Rubin is entitled to summary judgment as to this claim.

C.  Demotion From OPS Chief

The Plaintiff also claims that Rubin discriminated against him by removing him as provisional OPS Chief.  The Defendants claim that the Plaintiff has not offered a similarly situated comparator.  In order to show that other employees are similarly situated, a plaintiff must show that the "employees are similarly situated in all relevant respects."  Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003).  The Defendants argue that a legitimate comparator must have been a non-black person, who did not meet Rubin's new section chief requirements, who was not a provisional chief at the time of the test, and who was still allowed to compete for the permanent OPS Section Chief appointment.  (Reply Br. in Supp. of Defs.' Mot. for Summ. J., at 8).  The Defendants' suggestion of a comparator is too restrictive. There

is no dispute that the OPS Section Chief position was subsequently filled with three white individuals.  The first two, William May and then Patrick Cogan, both served as provisional chiefs prior to becoming the Section Chief of OPS.  Both May and Cogan served as OPS Section Chief in a provisional capacity.  The Defendants make no argument that they were more qualified than the Plaintiff.  Finally, the position was permanently filled by a white female, who had previously achieved the rank of captain.  The Defendants object to her being used as a similarly situated comparator, claiming that "[t]he selection of [Captain Thompson] is immaterial.  It does not affect the outcome of this lawsuit under the governing law." (Defs.' Resp. to Pl.'s Statement of Facts ¶ 99).  The Defendants make no effort to point the Court to the governing law, and do not make clear how a captain was more qualified than a provisional section chief.  The Plaintiff has shown that he was replaced by three white employees who had the same or less qualifications as he, and were thus similarly situated to the Plaintiff.  The Plaintiff has satisfied his prima facie burden.

The burden now shifts to the Defendants to demonstrate a legitimate, non-discriminatory reason for the employment decision.  See McDonnell Douglas Corp., 411 U.S. at 802.  This burden is "exceedingly light."  Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997).  The Defendants' proffered reason for the Plaintiff's reassignment was that the Plaintiff "was not fulfilling [OPS's] mission" because of the

high "backlog of employment applications, high number of firefighter vacancies, and the enormous amount of overtime being accrued by firefighters as a result." (Defs.' Mot. for Summ. J., at 15). The Defendants have also introduced evidence showing that there was a backlog of vacancies at the AFD.

The Plaintiff attempts to show pretext by arguing that (1) he was not responsible for the area of recruitment because Rubin had taken recruitment outside of the purview of OPS, and (2) the initial number of vacancies was due to a hiring freeze by the City that was beyond the Plaintiff's control. By way of retired Deputy Chief Kenneth Allen, the Plaintiff introduced evidence that he was not responsible for hiring. "Manns played no role in the budgeting of overtime for the department. Manns did not control the decision to hire new applicants. Manns was only responsible for background investigations. Manns was not responsible for the hiring freeze or the large number vacancies." (Allen Decl. ¶ 8; see also Allen Dep. at 17-18 ("The main reason [the AFD positions] were vacant was because we had about a 100 positions that the [C]ity would not allow us to fill. . . . it wasn't a freeze, but just in the fire department, before we could hire or start a class, we had to get approval. But they always kept at least - it was between 75 and 100 positions that we were never allowed to fill.")). Allen claims that he explained this to Rubin, but that Rubin continued to blame the Plaintiff for the recruitment problems. (Allen Decl. ¶¶ 9-10). Allen's

testimony is persuasive because he was Rubin's immediate predecessor.  Allen served as interim fire chief when the alleged recruitment problems existed, and knew the organizational structure such that he was qualified to know where the blame for the recruitment problems lay.   Tellingly, Rubin removed the responsibilities of recruitment from OPS in February 2004, about one month after Rubin became Fire Chief.  There is enough weakness and inconsistency that a reasonable jury could find pretext when the outgoing Chief said the recruiting problems were not a result of the Plaintiff's performance.  The Plaintiff's job duties, which required him to investigate alleged misconduct within the AFD, cast further doubt upon the Defendants' justifications.  Before his reassignment, the Plaintiff had personally investigated a race discrimination complaint against Rubin. There is also evidence that Rubin personally attempted to obstruct the Plaintiff's investigation of white employees.  (Allen Decl. ¶¶ 13-17, 24).  Through Allen's Declaration, the Plaintiff has presented enough weakness and implausibility that a reasonable jury could find pretext.

> D.    Administrative Leave With Pay Claim

Next, the Plaintiff argues that the Defendants should be liable because Rubin "intentionally discriminated against him on the basis of race by denying him administrative leave with pay while granting such pay to white employees."  (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 8).  The Plaintiff filed for administrative leave

with pay "for mental adjustments" soon after he was notified he would be removed from his provisional post as Section Chief.  (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 10).

The Defendants argue that the Plaintiff cannot establish a prima facie case of racial discrimination on the denial of paid leave claim.  First, the Defendants argue that the denial of administrative leave was not an adverse employment action. Administrative leave is part of the City's discipline policy under the City Code. Atlanta City Code § 114-532 allows the City to suspend an employee with pay in "emergency situations."  Contrary to the Defendants' claims, the Code provision does not mandate that the administrative leave with pay be exclusively a disciplinary or adverse measure.  The Code provision states that the affected employee must receive proper notice "*[s]hould* the action be an adverse action."  Atlanta City Code § 114-532(b) (emphasis added).  Therefore, the Code provision contemplates circumstances where paid leave is not an adverse action.  In addition, Rubin testified that "I granted [paid leave] in other circumstances as well [such as] when an employee expressed a specific need - usually medical or psychological in nature - that I believed warranted paid time off."  (Rubin Decl. ¶ 16).  It is difficult to conceive of scenarios where an employee would express a desire to begin what must be, by the Defendants'

definition, a "progressive discipline policy."  For these reasons, it is unlikely that the paid leave is only a disciplinary action.

In addition, the Defendants argue that the Plaintiff cannot meet the prima facie case for discrimination based on the denial of administrative leave because the Plaintiff did not qualify for the leave.  According to the City Code, administrative leave is available in situations where either (1) an employee committed a crime of moral turpitude or a felony, or (2) retaining the employee on active duty could result in damage to property or disrupt daily government operations generally.  The then-Deputy Chief Kenneth Allen, who signed off on the Plaintiff's request for leave, admitted that the Plaintiff did not meet the criteria to receive administrative leave. (Allen Dep. at 95).   The Plaintiff claims that Rubin "typically did not follow department policy in granting [administrative leave with pay]."  (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 10).  As noted above, Rubin admitted that he granted paid leave, in his discretion, "when an employee expressed a specific need - usually medical or psychological in nature - that I believed warranted paid time off."  (Rubin Decl. ¶¶ 14, 16).

The Plaintiff has submitted two instances in which Rubin granted paid leave to white employees.  One employee was granted paid leave after accepting a voluntary demotion because of medical problems and the other was granted a request upon being

demoted for disciplinary reasons.  The Defendants do not argue that either employee was eligible for paid leave under the City Code.  Still, the Defendants argue that the Plaintiff's prima facie case must fail because he cannot offer a similar comparator that was granted paid leave.  In particular, the two employees who were granted paid leave were both demoted from their positions.  However, for the prima facie analysis, the Plaintiff has offered two satisfactorily similar comparators, that is, white employees that were not qualified under the City Code to receive paid leave but were nonetheless granted it.

The burden now shifts to the Defendants to demonstrate a legitimate, non-discriminatory reason for the employment decision.  See McDonnell Douglas Corp., 411 U.S. at 802.  This burden is "exceedingly light."  Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997).  The Defendants have offered several legitimate reasons.  First, Rubin claims to have developed his own discretionary standards of when to grant paid leave in addition to the City Code qualifications.  As noted above, these post-hoc standards included situations "when an employee expressed a specific need - usually medical or psychological in nature - that I believed warranted paid time off." (Rubin Decl. ¶ 16).  The Plaintiff applied for paid leave to deal with the "mental adjustments" caused by the expiration of his term as provisional section chief.  (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 10).  The Defendants have made no attempt to

explain why the psychological strain from a de facto demotion does not meet the psychological needs requirement, and the Plaintiff has provided evidence of two white employees that were granted paid leave after their formal demotions.[2] There is at least a factual dispute as to why the Plaintiff's claim for paid leave failed to serve the "purpose behind" paid leave while the white employees did. (Defs.' Mot. for Summ. J., at 12).

The Defendants' other proffered reason is likewise insufficient to support summary judgment on the paid leave claim. The Defendants claim that "[i]f every employee that was simply reassigned - absent other compelling circumstances - was entitled to paid leave it would [abrogate] the City's vacation policy." (Defs.' Mot. for Summ. J., at 11). Despite the Defendants' characterizations, the Plaintiff was not "simply reassigned." (Defs.' Mot. for Summ. J., at 11). The Plaintiff may have been technically reassigned under the City Code, but he was also de facto demoted under federal law. As a result, given that Defendants' post-hoc reasons for the Plaintiff's

---

[2]The Plaintiff has alleged (although the Defendants dispute) that his pay decreased after he was removed from his provisional post of OPS Chief. (Comp. ¶ 72). Under federal law, "a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility." Hinson v. Clinch Co. Bd. of Educ., 231 F.3d 821, 829 (11th Cir. 2000) (explaining that determining whether employment action is adverse is a matter of *federal, not state, law*). Even without a reduction in pay, for purposes of this motion, the Court is satisfied that the transfer was adverse because of the decrease in prestige and responsibility from a provisional section chief to a captain.

exclusion do not exclude the Plaintiff, a jury could find the proffered reasons to be pretextual.

Rubin's admission that he likely would have granted the paid leave to the Plaintiff had he known about the request sooner further undermines the Defendants' proffered reasons.  In fact, Rubin claimed it would have been "highly likely" that paid leave would have been granted, but for the fact that Rubin "did not receive [the Plaintiff's request for paid leave] until at least a month after his reassignment." (Rubin Dep. at 91-93).  The fact that Rubin essentially admitted that he would have granted paid leave further emphasizes the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employers' proffered legitimate reasons" of the potential abrogating effects of granting paid leave to a reassigned employee.  Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004) In its entirety, the evidence supports a finding of the Defendants' proffered reasons to be pretextual.

     E.    Retaliation Claims

The Plaintiff also seeks damages for retaliation.  The Plaintiff alleges that he was removed from his position as provisional section chief and denied paid leave because he was investigating white employees - including Rubin - as part of his responsibilities at OPS.  Specifically, the Plaintiff alleges that two of his investigations

led to retaliation by Rubin.  In the first, the Plaintiff was investigating an EEOC charge filed against Rubin in April 2004 by a black employee.  (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 15).  The second investigation began in June 2004 to investigate the misuse of funds by a white captain.  (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 16).

To prove retaliation, a plaintiff must demonstrate that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal link exists between these two events.  The defendant then has the opportunity to proffer a legitimate, non-discriminatory reason for the adverse employment action. See E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000).

An employee receives protection under the participation clause if he or she participates in an investigation, proceeding, or hearing pursuant to an EEOC complaint.  See, e.g., Clover v. Total System Services, Inc., 176 F.3d 1346, 1352-53 (11th Cir. 1999) (citing 42 U.S.C. § 2000e-5(b) for proposition that "[i]t is clear that, at a minimum, the [participation clause] encompasses EEOC investigations of alleged discriminations")).  In their Brief in Support of the Motion for Summary Judgment, the Defendants argue that the Plaintiff's investigation of an EEOC complaint could only conceivably be protected under Title VII and not § 1981.  Because the Title VII claims were dismissed, the Defendants argue, a retaliation claim cannot be premised

on EEOC investigations.  However, the Defendants do not address this topic further in their Reply Brief, and certainly make no effort to explain how a possible retaliation by a white man against a black man (who is investigating a white man) is not protected under §1981's prohibition against racial discrimination.  After seemingly abandoning their Title VII / § 1981 distinction in their Reply Brief, the Defendants advance two arguments as to why the Plaintiff did not engage in a statutorily protected activity.  First, the Defendants argue that the Plaintiff did not file his own EEOC investigation until after the new selection process was announced.  Therefore, according to the Defendants, the Plaintiff's claims are illogical since a defendant cannot retaliate before a plaintiff's protected participation or expression takes place.  Second, the Defendants claim that there can be no actionable retaliation claim for the Plaintiff's role in "an employer's internal, in-house investigation." (Reply Br. in Supp. of Defs.' Mot. for Summ. J., at 10).

The Plaintiff's conduct in this case was protected under the "participation clause" of Title VII analysis.  Here, the Plaintiff was undertaking - as part of his regular job responsibilities - an investigation filed with the EEOC.  Protection under the participation clause does not require that a plaintiff file the complaint with the EEOC.  See generally Clover, 176 F.3d at 1346.  In Clover, the plaintiff was asked and agreed to participate in an investigation of sexual harassment by a male employee.

Id. at 1349.  Although the plaintiff "simply participated in an internal employer investigation," which is not covered as a protected activity, the Eleventh Circuit found that her activity was protected because the internal investigation began after the filing of a related EEOC charge.  Id. at 1352.  Because "the EEOC considers employer-submitted evidence on an equal footing with any evidence it gathers from other sources," participating in an internal investigation when an EEOC charge has been filed is considered "a form of participation . . . in an EEOC investigation [which] is sufficient to bring the employee within the protection of the participation clause." Id. at 1353.

Clover makes clear that a retaliation plaintiff need not file his own charge of discrimination with the EEOC in order to engage in protected participation.  Clover also dispels the Defendants' second argument - that there is no protection for participating in an internal investigation.  All that they require under Clover is that an EEOC charge be filed before the internal investigation begins (the Court in Clover chose not to decide "whether the participation clause extends to cover an employee's participation in an investigation conducted by her employer before receiving a notice of charge of discrimination from the EEOC.").  Id. at 1353 n.3.  In this case, the Plaintiff initiated an investigation in April 2004, in the wake of an EEOC charge filed

against Rubin.  Under <u>Clover</u>, the Plaintiff was engaged in a statutorily protected activity.

The Defendants next argue that the Plaintiff did not suffer an adverse employment action.  The Supreme Court recently enumerated the standard for an adverse employment action in the context of a retaliation claim, which is distinct from an adverse employment action for a discrimination claim.  <u>Burlington Northern & Sante Fe Railway Co. v. White</u>, 126 S. Ct. 2405 (2006); <u>see also</u> <u>Wallace v. Georgia Dept. of Transp.</u>, 212 Fed. Appx. 799, 801 (11th Cir. 2006) ("The Supreme Court made clear in that case that the standard defining an adverse employment action in the context of retaliation claim does not apply to a core Title VII discrimination claim").  To establish a retaliation claim, the plaintiff must establish that a reasonable employee would have found the action to be "materially adverse" or which might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington</u>, 126 S. Ct. at 2415.  A challenged action must do more than merely affront a "plaintiff's unusual subjective feelings" and cannot be a trivial harm that offends "a general civility code for the American workplace."  <u>Id.</u> However, a challenged action may be materially adverse even if the action was not related to the express terms and conditions of employment.  <u>Id.</u> at 2416 (emphasizing

that anti-retaliation standard is not to be as strict as standard to establish discrimination).

The Plaintiff did suffer an adverse employment action with respect to his denial of paid leave.  The Defendants do not dispute that a reasonable worker would not be dissuaded from investigating EEOC claims by denying paid leave.  The Defendants only argue that the Plaintiff "was not entitled to [paid leave]."  As discussed above, the Court is not persuaded by this rationale, and the Court is satisfied that denial of paid leave after a downward reassignment could be materially adverse to a reasonable employee.

The Plaintiff may also establish a retaliation claim based upon his reassignment.  As the Supreme Court has acknowledged, "[t]o be sure, reassignment of job duties is not automatically actionable.  Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case."  Burlington, 126 S. Ct. at 2417.  Viewed by itself, it is conceivable that the Plaintiff's reassignment might not support a retaliation claim.  After all, the Atlanta City Code § 114-312(f) makes clear that a provisional appointment is temporary.  A provisional appointment is appropriate only "[w]henever an *urgent* reason exists for filling a regular position in a class for which appropriate lists are not then available," and "[a]n appropriate eligible list for the position shall be established at the *earliest possible date*."  Id. (emphasis supplied).

However, the reassignment cannot be viewed separately, and must be considered as part of the entire "circumstances of the particular case." <u>Burlington</u>, 126 S. Ct. at 2417.

The Plaintiff alleges that Rubin decided to fill the Plaintiff's position with a permanent appointment after he began investigating the EEOC charges against Rubin. Moreover, evidence suggests that Rubin then instituted hiring qualifications that the Defendant believed would exclude the Plaintiff from competition.  (<u>See</u> Pl.'s Resp. to Defs.' Statement of Facts, Ex. 16, at 3) ("The [Plaintiff] had less than two years as a Captain.  Consequently, he did not have the time in grade to take the upcoming Battalion/Section Chief promotional examination. After the Battalion/Section Chief examination identified eligible candidates for the Section Chief position, the Charging Party would have been reassigned.").  Even if the change in procedures was not intended specifically for the Plaintiff, the Defendants admit that Rubin was never going to consider the Plaintiff for the permanent position.  (Defs.' Mot. for Summ. J., at 8) ("It is patently clear that Rubin, of his own accord, would not have voluntarily chosen Manns for the permanent position of Section Chief . . . .").  In sum, looking at the evidence chronologically, the Plaintiff conducted an investigation of Rubin. Subsequently, Rubin instituted new qualifications believed to exclude the Plaintiff from competition for the permanent post.  Then, Rubin removed the Plaintiff from his

provisional post  (in effect demoting the Plaintiff).  Taken together, a jury could find that "[a] reasonable employee facing the choice between retaining her job [and the possibility for promotion] and [investigating] a discrimination complaint might well choose the former."  Burlington, 126 S. Ct. at 2417.

The Defendants dispute the third prong of the Plaintiff's prima facie case, claiming there was no causation between the protected activity and the adverse employment action.  "To establish the causal connection, a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated.  At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action."  Clover, 176 F.3d at 1354 (citations omitted); see also Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1180 (11th Cir. 2003); Shannon v. Bellsouth Telecommunications, Inc., 292 F.3d 712, 716-17 (11th Cir. 2002) ("Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated.").

The Defendants suggest that the "causal link" to be examined should be "between Rubin's announcement of the new appointment process and [Manns's] reassignment, which occurred a month later." (Defs.' Mot. for Summ. J., at 13).  The Defendants' suggested link is inappropriate.  As discussed above, the protected

activity began in April 2004 when the Plaintiff investigated the EEOC complaint.  The adverse employment actions took place in July and August 2004.  There is sufficient evidence to show that Rubin was aware that the Plaintiff was investigating the EEOC complaint.  Indeed, the complaint was against Rubin personally.  Furthermore, the Plaintiff claims that once Rubin learned of the investigation, he "objected immediately and confronted Plaintiff about the charge.  Rubin then took steps to have the investigation removed from Plaintiff's oversight.  Plaintiff was removed from the investigation within weeks after receipt of the charge."  (Pl.'s Resp.  to Defs.' Mot. for Summ. J., at 15).  Therefore, there is ample evidence that Rubin knew of the investigation of the April 2004 EEOC charge at the time the Plaintiff was removed from his provisional post and then denied paid leave.  The Plaintiff's prima facie case for retaliation is satisfied.

The Defendants proffer two legitimate reasons for why the Plaintiff was denied paid leave: (1) that those previously granted paid leave were formally demoted, and (2) that allowing a reassigned employee to receive paid leave would abrogate the City's vacation policy.  As discussed above, there is sufficient evidence to find these reasons pretextual.

The Defendants' proffered reason for the Plaintiff's reassignment is that the Plaintiff was performing poorly in the area of a recruiting.  According to the

Defendants, the Plaintiff "was not fulfilling [OPS's] mission" because of the high "backlog of employment applications, high number of firefighter vacancies, and the enormous amount of overtime being accrued by firefighters as a result." (Defs.' Mot. for Summ. J., at 15). For reasons discussed at length above, the Plaintiff has presented enough weakness and implausibility that a reasonable jury could find pretext.

      F.    <u>Qualified Immunity</u>

Rubin argues that, in the alternative of a grant in favor for summary judgment on the merits, he is entitled to qualified immunity. Even if Rubin acted unconstitutionally, he may be shielded from liability for civil damages if he did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002) (<u>citing Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). Qualified immunity protects government officials from suits in their individual capacities so long as they were performing discretionary functions. <u>McClish v. Nugent</u>, 483 F.3d 1231, 1237 (11th Cir. 2007). The parties do not dispute that Rubin was acting within his discretionary power. Determining whether an official is entitled to qualified immunity requires asking two questions. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). First, viewing the facts in the light most favorable to the party asserting the injury, do the facts show that the

official's conduct violated a constitutional right?   Second, was the right clearly established?  Id.

The Supreme Court has explained that the salient question for the purpose of determining whether a right was "clearly established" is whether the state of the law at the time of the violation gave the official fair warning that his alleged treatment of the individual was unconstitutional.  Hope, 536 U.S. at 741.  "While officials must have fair warning that their acts are unconstitutional, there need not be a case 'on all fours,' with materially identical facts, before we will allow suits against them." Holloman v. Harland, 370 F.3d 1252, 1277 (2004) ("This circuit was recently chastised by the Supreme Court for taking an unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations.").

In Vinyard v. Wilson, 311 F.3d 1340, 1349-55 (11th Cir. 2002), the Eleventh Circuit held that a right is clearly established: (1) where specific words in the federal statute or constitutional provision render the law applicable to the challenged conduct; (2) where judicial decisions clearly apply to a wide variety of factual circumstances; and (3) where precedents involve materially similar facts.  Id. at 1350-51.  A plaintiff may overcome the qualified immunity defense without relying on fact-specific

caselaw when a preexisting constitutional rule applies with "obvious clarity."  Id. at 1352.

Rubin's chief argument for qualified immunity is that the Plaintiff's constitutional rights were not violated because race was not a "determinative influence" on any of Rubin's decisions regarding the Plaintiff.  (Defs.' Mot. for Summ. J., at 19).  For this proposition, Rubin cites Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000).  The Court is unconvinced that Reeves controls in this case.  For one thing, Reeves dealt with an age discrimination claim.  In the Court's view, the more appropriate (and not necessarily more lenient) standard is whether "the record indisputably establishes that the defendant in fact was motivated, at least in part, by lawful considerations."  Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1296 (11th Cir. 2000) (citing Foy v. Holston, 94 F.3d 1528, 1535 (11th Cir. 1996)).  Under Foy, "when an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage."  Foy, 94 F.3d at 1534-35.  In order for Rubin to prevail on this issue, "viewing the record in the light most favorable to [the Plaintiff]," does the record indisputably establish that "(a) objectively valid reasons did exist for the step [Rubin] took, and (b) that [the Defendants were] motivated, at least in part, by these lawful considerations."  Stanley, 219 F.3d at 1296.

At this stage, the evidence does not unequivocally show that Rubin was motivated partly by lawful reasons in his treatment of the Plaintiff. As discussed above, a reasonable jury could find Rubin's proffered reasons for the denial of paid leave and the Plaintiff's reassignment to be pretextual. In light of these observations, the Court cannot say that "the record *indisputably* establishes that the defendant was motivated, at least in part, by lawful considerations." Stanley, 219 F.3d at 1296 (emphasis supplied). A reasonable jury could find that Rubin "intentionally discriminated against [the Plaintiff] on account of race, and, in so doing, [reject the] proffered non-discriminatory reasons for [his] employment decisions." Alexander v. Fulton Co., Ga., 207 F.3d 1303, 1321 (11th Cir. 2000).

Rubin does not seriously argue that the law against discrimination and retaliation of government employees based on race was not clearly established at the time of the conduct in question: "Accordingly, Chief Rubin is entitled to qualified immunity and the Court need not address whether Manns' rights were clearly established under the specific facts of this case." (Defs.' Mot. for Summ. J., at 20). The Court is satisfied that previous caselaw regarding § 1981 discrimination and retaliation claims clearly applies to a "wide variety" of factual circumstances. Vineyard, 311 F.3d at 1350-51. That intentional workplace discrimination based on race was a violation of the law in 2004 is obvious. See, e.g., Alexander, 207 F.3d at

1321 ("[T]here can be no doubt that in December 1992 . . . it was clearly established that intentional discrimination in the workplace on account of race violated federal law.") (citations omitted).  In the Eleventh Circuit, for the § 1981 retaliation claim to be cognizable, the claim, at a minimum, must allege discrimination due to the Plaintiff's race.  See Andrews v. Lakeshore Rehabilitation Hosp., 140 F.3d 1405, 1412 (11th Cir. 1998) (discussing Little v. United Technologies, 103 F.3d 956 (11th Cir. 1997)).  "Numerous district courts in this circuit for several years consistently have concluded that the amended section 1981 covers post-hiring retaliation claims arising after the 1991 [Civil Rights Act]."  Andrews, 140 F.3d at 1411.  Therefore, it was clearly established in 2004 that a government employer may not retaliate against an employee because of that employee's race.

IV.  Conclusion

For the reasons set forth above, the Defendants' Motion for Summary Judgment [Doc. 59] is GRANTED in part and DENIED in part.  It is granted as to the Defendant City of Atlanta and denied as to the Defendant Rubin.

SO ORDERED, this 10 day of January, 2008.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge